**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| JOHN R. HESS, ) | |
| ) | CASE NO.    1:13CV1027 |
| Plaintiff, ) | |
| ) | |
| v. ) | JUDGE SARA LIOI |
| ) | |
| ) | MAGISTRATE JUDGE GREG WHITE |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social ) | |
| Security, ) | **REPORT & RECOMMENDATION** |
| ) | |
| Defendant. ) | |

Plaintiff John R. Hess ("Hess") challenges the final decision of the Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying his claim for Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(I) and 423 *et seq*.  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be VACATED and the case REMANDED.

**I. Procedural History**

On August 2, 2010, Hess filed an application for POD and DIB alleging a disability onset date of February 14, 2010 and claiming he was disabled due to chronic neck and back pain, and a hip sheer.  (Tr. 149, 173.)  His application was denied both initially and upon reconsideration. (Tr. 98-107, 108- 113.)

On November 8, 2011, an Administrative Law Judge ("ALJ") held a hearing during which Hess, accompanied by a non-attorney representative, and an impartial vocational expert

("VE") testified. (Tr. 36-61.) On November 15, 2011, the ALJ found Hess was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. (Tr. 22-31.) The ALJ's decision became final when the Appeals Council denied further review. (Tr. 1-4.)

## II. Evidence

*Personal and Vocational Evidence*

Age fifty-three (53) at the time of his administrative hearing, Hess is a "person closely approaching advanced age" under social security regulations. *See* 20 C.F.R. § 404.1563(d). He has a high school education and past relevant work as a HVAC installer and electrician. (Tr. 29.)

*Relevant Medical Evidence[1]*

In December 2006, Hess underwent an anterior cervical discectomy "with interbody arthrodesis C5-C6, using a structural allograft and anterior cervical plate fixation." (Tr. 243.) He returned to work, and continued working until February 2010 when he claimed to experience severe neck and back pain along with numbness and tingling in his hands and legs. (Tr. 44-45.) He was referred for an MRI of the lumbar spine without contrast, which showed a "small lateral disk herniation on the left L5-S1 with mild left foraminal stenosis." (Tr. 668.)

The following month, Hess presented to Teresa Dews, M.D., of the Cleveland Clinic Pain Management Center. (Tr. 405- 414.) He reported back pain that radiated to both arms and was aggravated by standing, walking for long periods, and extended inactivity. (Tr. 405.) He rated his pain an 8 on a scale of 10, and stated it "occurs constantly." (Tr. 405.) On examination, Dr. Dews noted "severe pain to palpation in the right paravertebral area from the inferior angle of the scapula to the upper back [and] severely limited flexion and extension due to pain." (Tr. 407.) Dr. Dews observed Hess' gait was antalgic and identified his lumbosacral spine muscles as trigger points. (Tr. 407.) She diagnosed lumbago and recommended work hardening,

---

[1] The record also contains medical records regarding Hess' chest pain, kidney stones, and right middle finger trigger release. Hess acknowledges in his Brief on the Merits that these alleged impairments are not pertinent to the instant action. (Doc. No. 12 at 2, fn 1.) Accordingly, corresponding records will not be discussed.

osteopathic manipulation therapy, and nonopioid medications.  (Tr. 407.)  Dr. Dews also believed Hess' cervical symptoms required further evaluation, and referred him for an EMG.  (Tr. 407.)

An EMG performed on May 3, 2010 was normal, finding "no electrodiagnostic evidence of cervical radiculopathy or entrapment neuropathy in the left upper limb."  (Tr. 415-416.)  Several weeks later, Hess underwent an MRI of the cervical spine without contrast.  (Tr. 307-308.)  This examination concluded Hess' C5/C6 fusion appeared to be uncomplicated with hardware and that the rest of his cervical spine was likewise uncomplicated.  (Tr. 307-308.)

Meanwhile, Hess began treatment with Williams Welches, D.O., in April 2010 for complaints of back, neck, shoulder and hand pain.  (Tr. 384-385.)  On examination, Dr. Welches noted a number of positive test results, including: standing flexion test of the left; standing restricted PSIS with extension on the left; upper pole stork test on the left; sitting flexion test on the right; sitting restricted PSIS with extension on the right; lower pole stork test on the left; standing breath test on the right; sitting breath test on the right; fabere compression test; straight leg raising test on the right; fabere test on the left for groin pain; and, spring test.  (Tr. 385.)   Dr. Welches diagnosed low back, neck, shoulder and hand pain; sacroiliac joint dysfuction; and, somatic dysfunction in the cervicals, thoracics, rib cage, lumbar, sacrum, pelvis and upper extremity.  (Tr. 385.)  He performed osteopathic manipulation therapy ("OMT") and recommended Hess return for OMT eight more times.  (Tr. 385-386.)

The record reflects Hess returned to Dr. Welches for evaluation and OMT on eleven occasions between May and October 2010.  (Tr. 369-382.)  He generally complained of pain in his neck, back, hip, and thoracic spine, sometimes also reporting pain in his leg, foot, ankle and groin.  (Tr. 369-382.)  Hess also reported nausea, headache, and dizziness, as well as tingling, numbness and weakness in his hands and fingers.  (Tr. 369-382.)  After several months of treatment, Hess reported "feeling a lot better" and noted a decrease in his pain level from a 7 out of 10, to a 3 or 4 out of 10.  (Tr. 376-382.)  Shortly thereafter, however, Hess began reporting increased pain in his back, hip, and thoracic spine, rating his pain an 8 out of 10.  (Tr. 372-375.)  At many (though not all) appointments during this time period, Dr. Welches noted positive test

results similar to those noted, *supra*. (Tr. 370-375, 378-382.)

The record reflects Hess also attempted two regimens of physical therapy, the first from May through July 2010, and the second from August through October 2010. (Tr. 353-362, 364-368.) Hess reported the physical therapy made him worse, however, and was discharged from the program after failing to return for scheduled sessions. (Tr. 353, 364.)

In August 2010, Hess underwent an MRI of the thoracic spine without contrast, which found that "multilevel disk desiccation is present with levels of minimal disk bulging that minimally indent the anterior thecal sac without cord compression." (Tr. 306.) The following month, Hess presented to Harold Mars, M.D., for a neurological consultation. (Tr. 583- 586.) Hess reported persistent pain in the posterior cervical area radiating caudally. (Tr. 583.) Dr. Mars indicated Hess had "known L5 disc herniation." *Id*. Although noting the May 2010 EMG was normal, Dr. Mars observed that "[Hess'] legs however feel weak and he complains of numbness and tingling paresthesias in both legs, more on the right than the left" and, further, "he has some tingling paresthesias in his hands and he states he may at times drop objects." *Id.* On physical examination, Dr. Mars noted Hess' gait was normal but observed his joints were tender and deep tendon reflexes hyperactive in both the lower and upper right extremities. (Tr. 584-585.) Dr. Mars diagnosed a myelopathy. (Tr. 585-586.) In October 2010, Dr. Mars ordered an EMG of Hess' lower extremities. (Tr. 588-589.) This EMG showed evidence of right sided sciatica. (Tr. 589, 590.)

In December 2010, Hess presented to several physicians for an evaluation of his back, neck, and spinal pain. On December 6, 2010, Augusto Hsia, M.D., at the Cleveland Clinic Center for Spine Health, noted "no significant cord signal changes or pathology to explain diffuse, vague symptoms," but remarked Hess has "a significant myofascial component to [his] pain." (Tr. 552.) He recommended Hess obtain a rheumatology consult as his "symptoms are more fibromyalgia like." *Id*. Dr. Hsia also recommended a second opinion with a neurologist regarding Hess' "vague extremity tingling/numbness, hyperreflexia/clonus." *Id*.

Several weeks later, Hess presented to rheumatologist Bijal Jayakar, M.D., for an evaluation of generalized myalgias, back pain, neck pain, and occasional pain in his ankles and

4

knees. (Tr. 527-534.) After physical examination and a review of Hess' medical history (including his prior EMGs and MRIs), Dr. Jayakar concluded that "[m]ost of his symptoms are due to Fibromyalgia." (Tr. 531.) She recommended exercise and a trial of Lyrica. (Tr. 532.)

Hess then presented Rani A. Sarkis, M.D., for a neurological evaluation on December 15, 2010. (Tr. 535-545.) On that date, Hess reported his neck, spinal and hip pain had "progressed and was constant," and rated it a 9 out of 10. (Tr. 535.) He also reported tingling across his hips, and pins and needles on all of his fingers which "has led him to drop things constantly nowadays." *Id.* On physical examination. Dr. Sarkis observed Hess' gait was antalgic, though he was "able to walk on heels and toes." (Tr. 538.) She also noted paraspinal tenderness and hyper-reflexia, and suggested differential diagnoses of Copper deficiency, "stiff man syndrome" or HTLV-1 infection. (Tr. 540.)

Hess returned to Dr. Mars in February 2011, complaining of increased back pain after tripping and falling. (Tr. 592.) Dr. Mars noted that recent x-rays demonstrated degenerative joint disease of the pelvis and lumbar spine. *Id.* He also observed that Hess was taking Lyrica for fibromyalgia. *Id.* Dr. Mars ordered an EMG of Hess' upper extremities, which occurred on March 2, 2011. (Tr. 592-594.) Dr. Mars interpreted this EMG as demonstrating "irritation at C6/7 on the right, right sided sciatica." (Tr. 595.) On physical examination, Dr. Mars noted Hess' deep tendon reflexes were hyperactive in his lower extremities and, further, that Hess "walks favoring the right lower extremity." *Id.* He diagnosed sciatica and cervical myelopathy, and increased the dosage of Hess' Lyrica prescription. (Tr. 596.)

Dr. Mars saw Hess again in April 2011. (Tr. 646-647.) Hess reported the effects of Lyrica were "variable," and "he has good days and bad days and has been to pain management." (Tr. 646.) Dr. Mars changed Hess' prescription from Vicodin to Percocet. (Tr. 647.) In a visit in May 2011, Hess reported "persistent pain in his neck radiating to his arms, with numbness and tingling paresthesias." (Tr. 641.) Dr. Mars found Hess' gait to be normal, but noted positive straight leg raising test bilaterally and "tightness in the paraspinous musculature." (Tr. 641.) He diagnosed chronic myofascitis, and scheduled Hess for a repeat EMG of the lower extremities and MRIs of the cervical and lumbar spines with and without contrast. (Tr. 642.)

5

Hess underwent these MRIs on June 2, 2011.  (Tr. 636-638.)  The MRI of Hess' cervical spine showed: (1) evidence of anterior cervical diskectomy and fusion at C5 and C6 with posterior bony hypertrophy and moderate bilateral facet and ligamentum flavum hypertrophy resulting in mild canal stenosis, mild compression of the posterior aspect of spinal cord, and mild bilateral neural foraminal narrowing; and, (2) multilevel mild discogenic and facet hypertrophic degenerative change with small central disk protrusion at C4-C5 that mildly deform the ventral aspect of the spinal cord.  (Tr. 638.)  The MRI of Hess' lumbar spine showed "multilevel mild discogenic and facet hypertrophic degenerative change most severe at L5-S1 where there is a small posterior annular tear and with the disk abuts but does not compress bilateral S1 nerve roots."  (Tr. 638.)  It also showed mild neural foraminal narrowing at L3-L4, L4-L5, and L5-S1.  (Tr. 638.)

Hess returned to Dr. Mars on June 3, 2011.  (Tr.  633-634.)  Dr. Mars noted that an EMG conducted on May 27, 2011 showed L5/S1 irritation on the right with paraspinal irritation.  (Tr. 633.)  He also interpreted the MRI of the lumbar spine as demonstrating a "herniated disc at L5/S1 with anular tear."  *Id*.  Dr. Mars saw Hess again on August 8, 2011, at which time his "gait [was] unsteady and he had difficulty in standing up from a deep chair."  (Tr. 630.)  Dr. Mars also noted that Hess had undergone an MRI of the thoracic spine on August 12, 2011, which was normal.  (Tr. 630-631.)  On August 18, 2011, Dr. Mars examined Hess and noted that his "[d]eep tendon reflexes remain very hyperactive with a cross-over and despite the negative MR scan, he continues to manifest a suggestive level at T8."  (Tr. 670.)   He diagnosed myelopathy, noting that "it may be at T8, however he did have his surgery in the C5/C6 area, and frequently there is a post-operative development of problems either above or below that level." (Tr. 671.)  Finally, he noted that "the only procedure left to do would be that of a CT myelogram," and recommended that Hess discuss this possibility with Iaian Kalfas, M.D., at the Cleveland Clinic Center for Spine Health.  (Tr. 671.)

On June 15, 2011, Dr. Mars completed an assessment of Hess' Physical Capacities.  (Tr. 626-629.)  He offered that Hess could sit for no more than three hours and stand/walk for no more than two hours in an eight hour work day.  (Tr. 626.)  He also found Hess would need an

6

opportunity to alternate sitting and standing at will throughout the day. *Id.* While able to use his hands adequately for simple grasping and pushing/pulling, Dr. Mars stated Hess could not do so for fine manipulation in either hand, nor for bilateral repetitive hand motions (such as writing, typing, or assembly.) *Id.* Dr. Mars further concluded Hess could not use either or both of this feet for repetitive movements in operating foot controls. *Id.* In addition, Dr. Mars concluded Hess could lift/carry up to twenty pounds occasionally, and ten pounds frequently. (Tr. 627.) He found Hess could only occasionally climb, balance, and reach above the shoulder level, but never stoop, kneel, crouch or crawl. *Id.* Dr. Mars stated Hess' cervical radiculopathy and L5/S1 disc herniation caused him pain and that it would prevent him from working full time even at the sedentary level. (Tr. 628.) Finally, Dr. Mars concluded Hess' pain had a slight effect on his ability to perform tasks requiring sustained attention and concentration. (Tr. 629.)

Hess returned to Dr. Mars on October 18, 2011. (Tr. 672-673.) At that time, Dr. Mars noted Dr. Kalfas felt "there was no surgical problem." (Tr. 672.) Dr. Mars diagnosed chronic myofascitis and insomnia; prescribed Topamax; and, referred Hess to a chiropractor. (Tr. 673.)

***State Agency Opinions***[2]

Linda Hall, M.D., reviewed Hess' medical records and prepared a Physical Residual Functional Capacity assessment on December 9, 2010. (Tr. 71-73.) She found Hess could stand/walk for "about 6 hours" and sit for "about 6 hours" in an eight hour work day. (Tr. 71.) In addition, Dr. Hall concluded Hess could lift/carry up to 20 pounds occasionally, and up to 10 pounds frequently. (Tr. 71.) She noted he had unlimited push/pull capacity, including operation of hand and/or foot controls (subject to his lift/carry restrictions). *Id.* Dr. Hall also offered Hess could occasionally climb ramps/stairs, stoop, crouch, and crawl, but never climb ladders, ropes or scaffolds. (Tr. 71-72.) She also found Hess was limited to "occasional overhead reaching bilaterally due to cervical neck fusion with decreased ROM neck and shoulders." (Tr. 72.) On April 8, 2011, W. Jerry McCloud, M.D., affirmed Dr. Hall's opinion as written. (Tr. 89.)

---

[2] The record contains opinions from state agency physicians regarding both Hess' physical and psychological capabilities. The state agency psychological assessments will not be recounted, however, as they are not material to resolution of the instant case.

*Hearing Testimony*

At the November 8, 2011 hearing, Hess testified to the following:

- He has a high school education. (Tr. 43.) He worked as an HVAC technician and electrician from December 1997 until February 2010. (Tr. 48-49.)

- In 2006, he had a discectomy. (Tr. 44.) He continued to work until February 2010, when his neck and back pain became too severe. At that time, he was also experiencing numbness and tingling in his legs and arms which made him "unable to perform any work." (Tr. 45.)

- He tried physical therapy but it "made some things worse." (Tr. 46.) His doctors are not discussing surgery at this point. (Tr. 46.)

- He lives with his wife. (Tr. 43.) He is able to do "very, very little" around the house. He tries to fold laundry, but must rest after folding only one or two shirts. He can no longer play the guitar because "my fingers [won't] work." He had been involved in doing accounting work for his church and managing church records, but stopped six months ago because of his pain and numbness. Prior to that, he would spend four to five hours per day working for his church. (Tr. 46-47.)

- His back, leg, and hand problems all prevent him from working. (Tr. 48.) He can sit for five to fifteen minutes before having to "get up and walk around for a little while." He can stand for five to fifteen minutes before having to sit or lay down. (Tr. 48.) He cannot walk very far or climb stairs before having to rest. (Tr. 51-52.) His most comfortable position is lying down. (Tr. 50.)

- He had trigger finger surgery on his right middle finger in 2010. (Tr. 49.) His finger is still numb and not "truly right." (Tr. 49-50.) His hands are numb and have lost a lot of strength. He cannot use a screwdriver or pick up coins. He "drops things a lot." He can lift a quart of juice, but it hurts when he pours it. (Tr. 50-51.)

- He does not sleep well because of his pain. He sleeps for two to three hours; is awake for two to three hours; and then sleeps again for two to three hours. (Tr. 52.) He naps "on and off all day long." (Tr. 52.)

- He falls a couple times a week. His legs "go numb" and he loses his balance and falls. (Tr. 52-53.)

- He has not had any psychiatric counseling during the past two years. (Tr. 53.)

The VE testified Hess had past relevant work as a (1) HVAC technician (medium, SVP 7, performed as heavy); and, (2) electrician (medium, SVP 7, performed as heavy). (Tr. 55.) The ALJ then posed the following hypothetical:

[I]f you would, would you please consider an individual the same age and education, that being a high school education, as Mr. Hess, that has the following limitations. We'll call this hypothetical number one.

Hypothetical number one can lift, carry, push and pull 20 pounds occasionally

8

>and 10 pounds frequently.  This person can sit for six hours, can stand and/or walk for six hours in a normal workday.  This person cannot climb ladders, ropes, or scaffolds.  Can only occasionally climb ramps and stairs.  This person can occasionally balance, kneel, stoop, crouch and crawl. This person must avoid work place hazards, such as unprotected heights or exposure to dangerous moving machinery.

(Tr. 56.)  The VE testified such a hypothetical individual would not be able to perform any of Hess' past work, either as he performed it or as normally performed in the national economy.  (Tr. 56.)  However, the VE testified such an individual could perform other jobs such as mail clerk (light, SVP 2); sales attendant (light, SVP 2); and, housekeeping, cleaner (light, SVP 2). (Tr. 56- 57.)

The ALJ then posed a second hypothetical that was the same as the first, but "added a limitation that in addition to all the limitations in hypothetical number one, the person was limited to only simple, routine tasks."  (Tr. 58.)  The VE testified the hypothetical individual would still be able to perform the three previously identified jobs.  (Tr. 58.)

The ALJ then posed a third hypothetical, which had "the same limitations as the person in hypothetical number one with the additional limitation that they can do no more than occasionally grasp, handle, finger and feel bilaterally."  (Tr. 58.)  The VE testified no jobs would exist for such a hypothetical individual.  (Tr. 58.)

Finally, Hess's non-attorney representative asked "if you were to add [to hypothetical number one] the need to sit/stand at will, and let's assume that that was every 15 to 20 minutes, what impact would that have on the ability to perform the jobs that you described in number one?"  (Tr. 59.)  The VE testified "[t]hat would reduce the level to sedentary, and even that would be somewhat limited."  (Tr. 59.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a

9

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[3]

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and, (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Hess was insured on his alleged disability onset date, February 14, 2010, and remained insured through the date of the ALJ's decision, November 15, 2011. (Tr. 22.) Therefore, in order to be entitled to POD and DIB, Hess must establish a continuous twelve month period of disability commencing between those dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

### IV. Summary of Commissioner's Decision

The ALJ found Hess established medically determinable, severe impairments, due to lumbar degenerative disc disease, cervical degenerative disc disease, and residuals from a cervical discectomy and plate fixation; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 24-25.) Hess was found incapable of performing his past work activities, but was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work. (Tr. 26-29.) The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Hess was not disabled. (Tr. 29-30.)

---

[3] The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. Analysis

### *Treating Physician Mars*

In his first and second assignments of error, Hess argues the ALJ failed to properly evaluate the medical opinions offered by his treating physician, Dr. Mars. (Doc. No. 12 at 1.) He maintains the ALJ failed to articulate "good reasons" for rejecting Dr. Mars' opinions, arguing the decision is "insufficiently specific to meet the Circuit's standard." *Id*. at 1, 13. Moreover, he argues the ALJ's failure to accord controlling weight to Dr. Mars' opinion is improper because the ALJ misinterpreted the objective medical evidence; mischaracterized the activities of daily living; and, "completely ignored" Dr. Mars' fine manipulation limitations. *Id.* at 16. Finally, Hess argues the ALJ improperly weighed the opinion evidence because the decision failed to acknowledge the diagnosis and treatment for fibromyalgia. Hess asserts this omission is particularly problematic given the decision's reliance on the lack of objective medical evidence to support a finding of non-disability. *Id*. at 17-19.

The Commissioner argues the ALJ's rejection of Dr. Mars' opinion is fully supported by substantial evidence. She notes Dr. Mars' progress notes frequently documented normal gait, strength and sensation, and cites to objective test results showing, at most, mild abnormalities. (Doc. No. 13 at 12.) Finally, the Commissioner maintains the ALJ did not err in relying on the lack of objective medical evidence under the circumstances, since "Dr. Mars' opinion does not even mention fibromyalgia as a basis for Plaintiff's pain." *Id*. at 14.

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[4]

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating

---

[4] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and
frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Here, the ALJ discussed Hess' Function Reports and hearing testimony; and, the objective medical evidence regarding his back/neck pain, and tingling and numbness in his arms, hands, and fingers. (Tr. 26-27.) The decision then evaluated the opinion evidence, assigning "great weight to the State agency medical consultant opinions that the claimant can perform light work with postural limitations and no hazards (Exhibit 3A)." (Tr. 28.) The ALJ went on to note, however, that "[n]o weight is given to the portion of the [state agency] opinion that says the claimant can only perform limited overhead reaching bilaterally; the EMG and examination findings . . . of record do not support such a limitation." (Tr. 27.) Lastly, the ALJ goes on to

discuss the opinions of Dr. Mars, evaluating his physical RFC assessment as follows:

> The opinion of treating neurologist Harold Mars, M.D., is assigned less weight. Dr. Mars expressed the opinion that the claimant can sit for three hours, stand/walk for two hours, needed a sit/stand option, and could not perform any fine manipulation or repetitive motion with his hands (Exhibit 16F). This opinion is not supported by the objective medical evidence, the report of activities of daily living, and Dr. Mars' own progress notes. Dr. Mars' clinical findings indicate largely normal gait (Exhibits 13F, 16F, & 17F).

(Tr. 28.)

The ALJ formulated the RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant is restricted from climbing ladders, ropes, and scaffolds. He can climb ramps and stairs no more than occasionally. The claimant can balance, stoop, kneel, and crouch no more than occasionally. He is restricted from crawling. Additionally, the claimant cannot perform work involving workplace hazards such as unprotected heights or dangerous moving machinery.

(Tr. 26.)

The Court finds the ALJ failed to articulate good reasons for rejecting Dr. Mars' opinions. The ALJ identified Dr. Mars as Hess' treating neurologist and, indeed, the record indicates Dr. Mars examined Hess on ten (10) separate occasions between September 2010 and October 2011. (Tr. 583-596, 646-647, 641-642, 633-634, 630-631, 670-673.) Thus, the ALJ was required to provide "good reasons" for failing to accord Dr. Mars' opinions controlling weight. He failed to do so. As discussed in more detail below, while the ALJ states summarily that Dr. Mars' opinion "is not supported by the objective medical evidence, the report of activities of daily living, and Dr. Mars' own progress notes," the decision fails to offer any explanation of how the ALJ reached this conclusion.

The ALJ recounted the objective medical evidence in some detail and reached the conclusion that the objective test results as a whole did not support functional limitations greater than that set forth in the RFC. However, the record reflects Dr. Mars evaluated this same body of objective testing and interpreted several of the results as demonstrating abnormalities, including the following: (1) a February 2010 MRI of the lumbar spine showing a small lateral disk herniation on the left L5-S1 (Tr. 583, 590, 668); (2) an October 2010 EMG of the lower

15

extremities showing right sided sciatica (Tr. 590); (3) February 2011 x-rays demonstrating degenerative joint disease of the pelvis and lumbar spine (Tr. 592); (4) a March 2011 EMG of the upper extremities showing irritation at C6/7 and right sided sciatica (Tr. 595); (5) a May 2011 EMG of the lower extremities showing L5/S1 irritation on the right with paraspinal irritation (Tr. 633); and, (6) a June 2011 MRI of the lumbar spine showing a herniated disc at L5/S1 with anular tear (Tr. 633.)  Based on his interpretation of these results, as well as his numerous physical examinations, Dr. Mars concluded Hess had significant postural and manipulative limitations, including that he could only stand/walk for two hours and sit for three hours in an eight hour workday; would need a sit/stand option; and, could not perform any fine manipulation or repetitive motion with his hands.  (Tr. 626-629.)  The ALJ simply does not explain the reasoning behind his rejection of Dr. Mars' interpretation of these objective test results, nor does he articulate a logical basis for failing to accord controlling weight to the functional limitations Dr. Mars assigned.

Likewise, the decision fails to explain how Dr. Mars' progress notes are inconsistent with his assessment of Hess' functional limitations.  While the decision states summarily that "Dr. Mars' clinical findings indicate largely normal gait," the ALJ does not acknowledge or discuss the fact that Dr. Mars also found antalgic gait or difficulty standing on several occasions, and frequently noted joint tenderness, hyperactive deep tendon reflexes, and/or positive straight leg raising.  (Tr. 585, 595, 641, 630, 670.)  Significantly, the ALJ does not explain how a clinical finding of normal gait has any relevance whatsoever to Dr. Mars' assessment of fine manipulation limitations.  As Hess correctly notes, the ALJ's failure to properly consider Dr. Mars' assessment of such limitations cannot be considered harmless error, as the VE expressly testified there would be "no jobs" for a hypothetical individual that could only occasionally grasp, handle, finger and feel bilaterally.  (Tr. 58.)   Finally, the ALJ fails to explain how Hess' daily activities undermine Dr. Mars' opinion.  While the decision states generally that Hess reported the ability to "take care of personal care (albeit with some difficulty)" and do some limited household chores, the ALJ does not discuss how this level of daily activity is inconsistent with Dr. Mars' sit/stand/walk and/or fine manipulative limitations.

16

The Court finds it noteworthy as well that, in rejecting Dr. Mars' opinion, the decision fails to mention any of the factors set forth in 20 C.F.R. § 404.1527(c), such as the length of the treating relationship, the frequency of examination, the nature and extent of the treatment relationship, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision. While the Commissioner argues the ALJ provided numerous, well-supported reasons to substantiate his finding of non-disability, the fact remains the ALJ did not clearly connect any of his reasons to the rejection of Dr. Mars' specific opinions.

Accordingly, the Court finds the ALJ failed to provide "good reasons" for according "less weight" to Dr. Mars' assessment of Hess' functional limitations. The Court, therefore, recommends this matter be remanded to afford the ALJ an opportunity to sufficiently evaluate and explain the weight ascribed to the limitations assessed by Dr. Mars. As the Court is recommending a remand for further proceedings, and in the interests of judicial economy, the Court will not consider Hess' remaining assignments of error. [5]

## VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence. Accordingly, the decision of the Commissioner should be VACATED and the case REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

s/ Greg White
United States Magistrate Judge

Date: February 20, 2014

---

[5] The Commissioner correctly notes Dr. Mars did not diagnosis Hess with fibromyalgia. However, his treatment notes acknowledge Hess had been so diagnosed by another physician (Dr. Jayakar) and that Hess was taking prescription medication for that condition. (Tr. 592.) On remand, the ALJ should consider the record evidence regarding Hess' fibromyalgia in assessing his RFC, in accordance with Social Security Ruling 12-02, 2012 WL 3104869 (July 25, 2012).

**OBJECTIONS**
   **Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.**  *See United States v. Walters*, **638 F.2d 947 (6th Cir. 1981).**
*See also Thomas v. Arn*, **474 U.S. 140 (1985),** *reh'g denied*, **474 U.S. 1111 (1986).**